## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| LOGAN MULLINS, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   V<br>.<br>AZZ, INC., THOMAS E. FERGUSON, and PAUL W. FEHLMAN,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Logan Mullins ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant AZZ, Inc. ("AZZ" or the "Company") common stock between April 22, 2015 through January 8, 2018 inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      AZZ is a global provider of galvanizing services, welding solutions, specialty electrical equipment and highly engineered services to the power generation, transmission, distribution, refining and industrial markets. It has two distinct operating segments: the Energy Segment and Galvanizing Segment. AZZ Galvanizing provides metal finishing solutions. AZZ Energy is dedicated to delivering safe and reliable transmission of power from generation sources to end customers, and automated weld overlay solutions for corrosion and erosion mitigation to critical infrastructure in the energy markets worldwide. This case concerns revenue recognition by AZZ Energy, or the "Energy Segment."

3.      On January 9, 2018, AZZ issued a press release disclosing that it "should have accounted differently for certain contracts within its Energy Segment." The Company said that "had determined that, in the case of contracts for which revenue was recorded upon contract completion and transfer of title, the Company instead should have applied the percentage of completion method."

4.      The Company said it "is currently reviewing whether its historical accounting for these contracts differs materially from the percentage-of-completion method and if there are any significant impacts to the Company's audited consolidated financial statements…" for the fiscal years ended February 2015, 2016 and 2017, as well as for the quarters ending May 31 and August 30, 2017.

5.      The Company also said that as an apparent function of multiple years of mis-reporting its financial results, it "is currently unable to file its Quarterly Report on Form 10-Q for the quarter ended November 30, 2017." The Company then filed a Notification of Late Filing with the Securities and Exchange Commission.

6.     The January 9, 2018 statement came after AZZ spent more than two-and-a-half years supposedly evaluating accounting standards concerning revenue recognition.

7.     On this news, AZZ's share price fell more than 6 percent, causing millions in losses to investors.

8.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose (i) that it misstated revenues for its Energy Segment for the duration of the Class Period; (ii) that it had failed to report revenues in compliance with FASB's Accounting Standards Codification 605-35-25-92, which says that "the completed contract method may be used as an entity's basic accounting policy in circumstances in which financial position and results of operations would not vary materially from those resulting from use of the percentage-of-completion method (for example, in circumstances in which an entity has primarily short-term contracts)," (iii) that the Company lacked adequate internal controls over financial reporting; (iv) that its purported efforts – over more than two years – to evaluate revenue recognition standards had been an apparent failure; and that (v) as a result of the foregoing, AZZ's publicly disseminated financial statements were materially false and misleading.

## JURISDICTION AND VENUE

9.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.  Additionally, many of the acts and practices complained of herein occurred in substantial part in this District, and witnesses and individual defendants are located in here.

13.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff Logan Mullins was a shareholder of AZZ during the Class Period. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

15.     Defendant AZZ, Inc. is a Texas corporation with its principal executive offices located at One Museum Place, Suite 500, 3100 West 7th Street, Fort Worth, Texas.  AZZ provides galvanizing services, welding solutions, specialty electrical equipment and highly engineered services to the power generation, transmission, distribution, refining and industrial markets. Its Energy Segment provides specialized products and services to support industrial, nuclear and electrical applications. Its products include custom switchgear, electrical enclosures, medium and

high-voltage bus ducts, explosion proof and hazardous duty lighting, nuclear safety-related equipment and tubular products. The Energy Segment also focuses on extension of life cycle for the power generation, refining and industrial infrastructure, through automated weld overlay solutions for corrosion and erosion mitigation.  The Company trades on the New York Stock Exchange under the ticker symbol "AZZ."

16.     Defendant Thomas E. Ferguson ("Ferguson") has served at all relevant times as AZZ's President and Chief Executive Officer.

17.     Defendant Paul W. Fehlman ("Fehlman") has served at all relevant times as AZZ's Senior Vice President and Chief Financial Officer.

18.     Collectively, Ferguson and Fehlman are referred to throughout this complaint as the "Individual Defendants."

19.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**A.**   ***Materially False And Misleading Statements Made During the Class Period***

      **(a)**   ***The April 22, 2015 Form 10-K.***

20.     The Class Period begins on April 22, 2015. On that day, AZZ filed a Form 10-K with the SEC for the fiscal year ended February 28, 2015.  It also issued a press release entitled "AZZ incorporated Reports Financial Results for the Fourth Quarter and Fiscal Year 2015," summarizing the financial and operating results for the period ended February 28, 2015.

21.     In pertinent part, the Form 10-K provided revenue figures for the Energy Segment.

|  | 2015 | 2014 |
|---|---|---|
|  | *(In thousands)* | |
| **Net sales:** | | |
| Energy | $ 458,339 | $ 416,106 |
| Galvanizing Services | 358,348 | 335,617 |
| Total Net Sales | $ 816,687 | $ 751,723 |

22.     The Company also disclosed its practices with respect to revenue recognition:

Revenue Recognition – Revenue is recognized for the Energy Segment upon transfer of title and risk to customers, or based upon the percentage of completion method of accounting for electrical products built to customer specifications and for services under long term contracts. We typically recognize revenue for the Galvanizing Service Segment at completion of the service unless we specifically agree with the customer to hold its material for a predetermined period of time after the completion of the galvanizing process and, in that circumstance, we invoice and recognize revenue upon shipment. Customer advanced payments presented in the balance sheets arise from advanced payments received from our customers prior to shipment of the product and are not related to revenue recognized under the percentage of completion method. The extent of progress for revenue recognized using the percentage of completion method is measured by the ratio of contract costs incurred to date to total estimated contract costs at completion. Contract costs include direct labor and material and certain indirect costs. Selling, general and administrative costs are charged to expense as incurred. Provisions for estimated losses, if any, on uncompleted contracts are made in the period in which such losses are able to be determined. The assumptions made in determining the estimated cost could differ from actual performance resulting in a different outcome for profits or losses than anticipated.

23.     The 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting.  The 10-K said that:

**Evaluation of Disclosure Controls and Procedures**
As of February 28, 2015, the Company's management, with the participation of its principal executive officer and principal financial officer, have evaluated, as required by Rule 13a-15(e) under the Securities Exchange Act of 1934 ("the Exchange Act"), the effectiveness of the Company's disclosure controls and procedures. Based on that evaluation, the principal executive officer and principal financial officer concluded that, as of February 28, 2015, the Company's disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and were effective to provide reasonable assurance that such information is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls Over Financial Reporting**
There have been no changes in the Company's internal control over financial reporting during the three months ended February 28, 2015, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Management's Report on Internal Controls Over Financial Reporting**
The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Management, with the participation of its principal executive officer and principal financial officer assessed the effectiveness, as of February 28, 2015, of the Company's internal control over financial reporting based on the criteria for effective internal control over financial reporting established in "Internal Control — Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the assessment, management concluded that the Company maintained effective internal control over financial reporting as of February 28, 2015. Management's assessment and conclusion on the effectiveness of internal control over financial reporting did not include an assessment of the internal controls of Zalk Steel, whose acquisition was completed on June 30, 2014. The assets acquired from Zalk Steel comprised approximately 1.2% of the Company's total assets as of February 28, 2015. The Zalk Steel acquisition resulted in revenues and net income consisting of less than 1.0% of the Company's consolidated revenues and net income for the year ended February 28, 2015.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements or fraud. Any control system, no matter how well designed and operated, is based upon certain assumptions and can provide only reasonable, not absolute, assurance that its objectives will be met.

The effectiveness of the Company's internal control over financial reporting as of February 28, 2015, has been audited by BDO USA, LLP, an independent registered public accounting firm, as stated in their attestation report included herein.

24.     The Individual Defendants signed the April 22, 2015 Form 10-K, and also signed

the following certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"):

1. I have reviewed this Yearly Report on Form 10-K of AZZ incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

25.    The Company's April 22, 2015 press release reiterated the full-year revenue figures found in the 10-K, and also reported quarterly revenue figures for the Energy Segment:

Revenues for the Energy Segment for the fourth quarter of fiscal 2015 were $97.2 million as compared to $103.5 million for the same quarter last year, decreasing 6.1 percent. … For fiscal 2015, revenues increased 10.1 percent to $458.3 million and operating income decreased 13.1 percent to $38.7 million compared to $416.1 million and $44.5 million respectively, in the prior year period.

### (b)    *The July 1, 2015 Form 10-Q.*

26.    A few months later, on July 1, 2015, AZZ filed with the SEC its quarterly report on Form 10-Q for the three-month period ended May 31, 2015. The July 1, 2015 Form 10-Q made the following statements concerning Energy Segment revenue:

| | Three Months Ended | |
| --- | --- | --- |
| | 5/31/2015 | 5/31/2014 |
| | *(In thousands)(unaudited)* | |
| Revenue: | | |
| Energy | $    137,003 | $    130,521 |
| Galvanizing Services | 91,885 | 85,605 |
| Total Revenue | $    228,888 | $    216,126 |

27.     The Company also disseminated these revenue figures in a press release dated

July 1, 2015.

28.     In that same July 1, 2015 Form 10-Q, AZZ said it had begun to evaluate new

revenue-recognition standards.

> In May 2014, the FASB issued ASU 2014-09, "Revenue from Contracts with
> Customers", issued as a new Topic, Accounting Standards Codification (ASC)
> Topic 606 ("ASU 2014-09"). The new revenue recognition standard provides a
> five-step analysis of transactions to determine when and how revenue is recognized.
> The premise of the guidance is that a Company should recognize revenue to depict
> the transfer of promised goods or services to customers in an amount that reflects
> the consideration to which the entity expects to be entitled in exchange for those
> goods or services. ASU 2014-09 can be adopted by the Company either
> retrospectively or as a cumulative-effect adjustment as of the date of adoption. On
> April 1, 2015, the FASB decided to defer the effective date of the new revenue
> standard by one year. As a result, public entities would apply the new revenue
> standard to annual reporting periods beginning after December 15, 2017. This
> standard will be effective for the Company beginning in fiscal 2019. The Company
> is currently evaluating the new guidance and has not determined the impact this
> standard may have on its financial statements or decided upon the method of
> adoption.

29.     The July 1, 2015 Form 10-Q once again assured investors of the effectiveness of

the Company's internal control over financial reporting.  The 10-Q said that:

> Under the supervision and with the participation of the Company's Chief Executive
> Officer and Chief Financial Officer, management of the Company has evaluated
> the effectiveness of the design and operation of the Company's disclosure controls
> and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities
> Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the
> period covered by this report. Based upon that evaluation, the Chief Executive
> Officer and the Chief Financial Officer concluded that the Company's disclosure
> controls and procedures were effective and provide reasonable assurance, as of the
> end of the period covered by this report, that information required to be disclosed
> by us in our reports filed or submitted under the Exchange Act is recorded,
> processed, summarized and reported within the time periods specified in the SEC's
> rules and forms and were effective to provide reasonable assurance that such
> information is accumulated and communicated to our management, including our
> principal executive and financial officers, as appropriate to allow timely
> discussions regarding required disclosure.

There have been no significant changes in the Company's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

30.     Finally, the Company's July 1, 2015 Form 10-Q was signed by Fehlman. Both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### (c)     The September 29, 2015 Form 10-Q.

31.     On September 29, 2015, the Company filed another Form 10-Q. The September 29, 2015 10-Q reported the following revenue figures for the Energy Segment:

| Three Months Ended August 31, | | | | Six Months Ended August 31, | | | |
|---|---|---|---|---|---|---|---|
| | 2015 | | 2014 | 2015 | | | 2014 |
| | | | | *(Unaudited)* *(In thousands)* | | | |
| **Net Sales:** | | | | | | | |
| Energy | $ | 110,777 | $ 100,560 | $ | | 247,780 | $ 231,081 |
| Galvanizing Services | | 103,469 | 92,856 | | | 195,354 | 178,461 |
| Total net sales | | 214,246 | 193,416 | | | 443,134 | 409,542 |

32.     The Company also disseminated the above revenue chart in a press release on September 29, 2015.

33.     In the September 29, 2015 Form 10-Q, AZZ also said that was evaluating revenue-recognition standards.  It repeated, in substantially similar language, the statement in paragraph 28 above, from the July 1, 2015 10-Q.

34.     The September 29, 2015 Form 10-Q once again assured investors of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially similar language, the assurance from the July 1, 2015 10-Q in paragraph 29 above.

35.     Finally, the Company's September 29, 2015 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### (d)     The January 8, 2016 Form 10-Q.

36.     The Company next released inaccurate financial information in its January 8, 2016 Form 10-Q.  The Company reported the following revenue for the Energy Segment:

| Three Months Ended November 30, | | | Nine Months Ended November 30, | | |
|---|---|---|---|---|---|
| | 2015 | 2014 | 2015 | | 2014 |
| | | | *(Unaudited)* *(In thousands)* | | |
| Net Sales: | | | | | |
| Energy | $ 136,007 | $ 130,052 | $ | 383,787 | $ 361,133 |
| Galvanizing Services | 106,440 | 94,781 | | 301,794 | 273,243 |
| Total net sales | 242,447 | 224,833 | | 685,581 | 634,376 |

37.     The Company also disseminated the above revenue chart in a press release on January 8, 2016.

38.     In the January 8, 2016 Form 10-Q, AZZ once again said that it was evaluating revenue-recognition standards.  It repeated, once again, in substantially similar language, the statement in paragraph 28 above, from the July 1, 2015 10-Q.

39.     The, January 8, 2016 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially similar language, the assurance from the July 1, 2015 10-Q in paragraph 29 above.

40.     Finally, the Company's January 8, 2016 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

**(e)** **The April 21, 2016 Form 10-K.**

41.     The Company made its next inaccurate release of financial information in its Form 10-K filed April 21, 2016.  The Company reported the following revenue for the Energy Segment:

|  | **2016** | | **2015** | |
|---|---|---|---|---|
| | *(In thousands)* | | | |
| **Net sales:** | | | | |
| Energy | $ | 500,830 | $ | 458,339 |
| Galvanizing | | 402,362 | | 358,348 |
| Total Net Sales | $ | 903,192 | $ | 816,687 |

42.     The Company repeated the above revenue chart in a press release issued April 21, 2016, in which it also announced that "Revenues for the Energy Segment for the fourth quarter of fiscal 2016 were $117.0 million as compared to $97.2 million for the same quarter [a year earlier.]"

43.     The Company described its revenue recognition practices in language substantially identical to that used in the April 22, 2015 Form 10-K, set forth in paragraph 22 above.

44.     The April 21, 2016 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting.  It repeated, in substantially similar language, the statements concerning internal controls from its April 22, 2015 Form 10-K, set forth in paragraph 23 above.

45.     In the April 21, 2016 Form 10-Q, AZZ once again said that it was evaluating revenue-recognition standards.  It repeated, once again , in substantially identical language, the statement in paragraph 28 above, from the July 1, 2015 10-Q.

46.     The Company's April 21, 2016 Form 10-K was signed by the Individual Defendants, Ferguson and Fehlman, and contained SOX certifications substantially identical to those found in the April 22, 2015 Form 10-K, set forth in paragraph 24 above.

#### (f)    *The July 5, 2016 Form 10-Q.*

47.    The Company made its next inaccurate dissemination of financial information in a Form 10-Q filed on July 5, 2016.  The Company reported the following revenue for the Energy Segment:

| Three Months Ended May 31, | | | | |
|---|---|---|---|---|
| | 2016 | | 2015 | |
| | *(Unaudited)* | | | |
| | *(In thousands)* | | | |
| Net Sales: | | | | |
| Energy | $ | 138,102 | $ | 137,003 |
| Galvanizing | | 104,565 | | 91,885 |
| Total net sales | | 242,667 | | 228,888 |

48.    The Company also disseminated the above revenue chart in a press release on July 5, 2016.

49.    In the July 5, 2016 Form 10-Q, AZZ once again said that it was evaluating revenue-recognition standards.  It repeated, once again , in substantially identical language, the statement in paragraph 28 above, from the July 1, 2015 10-Q.

50.    The July 5, 2016 Form 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially identical language, the assurance from the July 1, 2015 10-Q in paragraph 29 above.

51.    Finally, the Company's July 5, 2016 Form 10-Q was signed by Fehlman, and Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### *(g)     The October 5, 2016 Form 10-Q.*

52.     The Company made its next inaccurate dissemination of financial information in a Form 10-Q filed on October 5, 2016.  The Company reported the following revenue for the Energy Segment:

| | Three Months Ended August 31, | | | Six Months Ended August 31, | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | | 2016 | | 2015 |
| | | | | *(Unaudited)*<br>*(In thousands)* | | |
| **Net Sales:** | | | | | | |
| Energy | $ 97,601 | $ 110,777 | $ | 235,703 | $ | 247,780 |
| Galvanizing | 97,444 | 103,469 | | 202,009 | | 195,354 |
| Total net sales | 195,045 | 214,246 | | 437,712 | | 443,134 |

53.     The Company also disseminated the above revenue chart in a press release on July 5, 2016.

54.     In the October 5, 2016 Form 10-Q, AZZ once again said that it was evaluating revenue-recognition standards.  It repeated, once again, in substantially similar language, the statement in paragraph 28 above, from the July 1, 2015 10-Q.

55.     The October 5, 2016 Form 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially identical language, the assurance from the July 1, 2015 Form 10-Q in paragraph 29 above.

56.     Finally, the Company's October 5, 2016 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### (h)    *The January 6, 2017 Form 10-Q.*

57.    The Company made its next inaccurate dissemination of financial information in a Form 10-Q filed on January 6, 2017.  The Company reported the following revenue for the Energy Segment:

| | Three Months Ended November 30, | | | Nine Months Ended November 30, | | |
| | 2016 | 2015 | | 2016 | | 2015 |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | *(Unaudited)* *(In thousands)* | | |
| **Net Sales:** | | | | | | |
| Energy | $    135,553 | $    136,007 | $ | 371,256 | $ | 383,787 |
| Galvanizing | 91,906 | 106,440 | | 293,915 | | 301,794 |
| Total net sales | 227,459 | 242,447 | | 665,171 | | 685,581 |

58.    The Company also disseminated the above revenue chart in a press release on January 6, 2017.

59.    In the January 6, 2017 Form 10-Q, AZZ once again said that it was evaluating revenue-recognition standards.  It repeated, once again, in substantially similar language, the statement in paragraph 28 above, from the July 1, 2015 Form 10-Q.

60.    The January 6, 2017 Form 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially similar language, the assurance from the July 1, 2015 Form 10-Q in paragraph 29 above.

61.    Finally, the Company's January 6, 2017 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### (i)    *The April 20, 2017 Form 10-K.*

62.    The Company made its next inaccurate release of financial information in its Form 10-K filed April 20, 2017.  The Company reported the following revenue for the Energy Segment:

|  | 2017 | | 2016 | |
|---|---|---|---|---|
|  | *(In thousands)* | | | |
| **Net sales:** | | | | |
| Energy | $ | 483,394 | $ | 500,830 |
| Galvanizing | | 375,536 | | 402,362 |
| Total Net Sales | $ | 858,930 | $ | 903,19 |

63.     The Company repeated the above revenue chart in a press release issued April 20, 2017, in which it also announced that "Revenues for the Energy segment for the fourth quarter of fiscal 2017 were $112.1 million as compared to $117.0 million for the same quarter [a year earlier], decreasing by 4.2 percent."

64.     The Company described its revenue recognition practices in language substantially similar to that used in the April 22, 2015 Form 10-K, set forth in paragraph 22above.

65.     The April 20, 2017 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting.  It repeated, in substantially similar language, the statements concerning internal controls from its April 22, 2015 Form 10-K, set forth in paragraph 23 above.

66.     In the April 20, 2017 Form 10-Q, AZZ said it believed the new accounting standards it had been evaluating for nearly two years might have an impact:

> In May 2014, the FASB issued ASU 2014-09, "Revenue from Contracts with Customers", issued as a new Topic, Accounting Standards Codification (ASC) Topic 606 ("ASU 2014-09"). The new revenue recognition standard provides a five-step analysis of transactions to determine when and how revenue is recognized. The premise of the guidance is that a Company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 can be adopted by the Company either retrospectively or as a cumulative-effect adjustment as of the date of adoption. On April 1, 2015, the FASB decided to defer the effective date of the new revenue standard by one year. As a result, public entities would apply the new revenue standard to annual reporting periods beginning after December 15, 2017. This

standard will be effective for the Company beginning in fiscal 2019. The Company is planning on adopting this standard retrospectively. We believe this standard will impact the current accounting for contracts accounted for under the percentage of completion method of revenue recognition, however the overall impact to the prior year financial results is still under review.

67.     The Company's April 20, 2017 Form 10-K was signed by the Individual Defendants, Ferguson and Fehlman, and contained SOX certifications substantially similar to those found in the April 22, 2015 Form 10-K, set forth in paragraph 24 above.

### *(j)* ***The July 6, 2017 Form 10-Q.***

68.     The Company made its next inaccurate dissemination of financial information in a Form 10-Q filed on July 6, 2017.  The Company reported the following revenue for the Energy Segment:

| | Three Months Ended May 31, | |
| | 2017 | 2016 |
| --- | --- | --- |
| | *(Unaudited)* *(In thousands)* | |
| Net Sales: | | |
| Energy | $  116,474 | $   138,102 |
| Metal Coatings | 92,077 | 104,565 |
| Total net sales | 208,551 | 242,667 |

69.     The Company also disseminated the above revenue chart in a press release on July 6, 2017.

70.     In the July 6, 2017 Form 10-Q, AZZ the Company once again said that it planned to implement new accounting standards. It said:

In May 2014, the FASB issued ASU 2014-09, "Revenue from Contracts with Customers", issued as a new Topic, Accounting Standards Codification (ASC) Topic 606 ("ASU 2014-09"). The new revenue recognition standard provides a five-step analysis of transactions to determine when and how revenue is recognized. The premise of the guidance is that a Company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 can be adopted by the Company either

retrospectively or as a cumulative-effect adjustment as of the date of adoption. This ASU is effective for public entities for reporting periods beginning after December 15, 2017. This standard will be effective for the Company beginning in fiscal 2019. The Company is planning on adopting this standard retrospectively. We believe this standard will impact the current accounting for contracts accounted for under the percentage of completion method of revenue recognition, however the overall impact to the prior year financial results is still under review.

71.     The July 6, 2017 Form 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially similar language, the assurance from the July 1, 2015 10-Q in paragraph 29above.

72.     Finally, the Company's July 6, 2017 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

### (k)     *The October 3, 2017 Form 10-Q.*

73.     The Company made its next inaccurate dissemination of financial information in a Form 10-Q filed on October 3, 2017.  The Company reported the following revenue for the Energy Segment:

|  | Three Months Ended August 31, | | Six Months Ended August 31, | |
| --- | --- | --- | --- | --- |
|  | 2017 | 2016 | 2017 | 2016 |
|  | *(Unaudited)* | | | |
|  | *(In thousands)* | | | |
| **Net Sales:** | | | | |
| Energy | $      91,377 | $      97,601 | $      207,850 | $      235,703 |
| Metal Coatings | 99,030 | 97,444 | 191,108 | 202,009 |
| Total net sales | 190,407 | 195,045 | 398,958 | 437,712 |

74.     The Company also disseminated the above revenue chart in a press release on October 3, 2017.

75.     In the October 3, 2017 Form 10-Q, AZZ once again said that it had adopted new revenue-recognition standards. It said:

In May 2014, the FASB issued ASU 2014-09, "Revenue from Contracts with Customers", issued as a new Topic, Accounting Standards Codification (ASC) Topic 606 ("ASU 2014-09"). The new revenue recognition standard provides a

five-step analysis of transactions to determine when and how revenue is recognized. The premise of the guidance is that a Company should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 can be adopted by the Company either retrospectively or as a cumulative-effect adjustment as of the date of adoption. This ASU is effective for public entities for reporting periods beginning after December 15, 2017. This standard will be effective for the Company beginning in fiscal 2019. The Company is planning on adopting this standard retrospectively. We believe this standard will impact the timing of revenue recognition for contracts which contain multiple performance obligations with revenue recognized over time, however the overall impact to the prior year financial results is still under review.

76.     The October 3, 2017 Form 10-Q also assured investors, once again, of the effectiveness of the Company's internal control over financial reporting.  The 10-Q repeated, in substantially similar language, the assurance from the July 1, 2015 Form 10-Q in paragraph 29 above.

77.     Finally, the Company's October 3, 2017 Form 10-Q was signed by Fehlman, and both Individual Defendants signed SOX certifications substantially similar to those in paragraph 24 above.

**B.   *The Truth Emerges – Disclosures At The End Of The Class Period***

78.     On January 9, 2017, before the markets opened, the Company issued a press release and filed the same on Form 8-K with the SEC, entitled "AZZ Inc to Review Accounting Methodology Resulting in a Delay of the Issuance of its Fiscal Year 2018 Third Quarter Form 10-Q. AZZ Inc. Updates Guidance for Fiscal 2018 Revenue and Earnings per Share." The press release stated, in pertinent part:

> January 9, 2018 - *FORT WORTH, TX* - AZZ Inc. (NYSE: AZZ), (the "Company"), a global provider of metal coating services, welding solutions, specialty electrical equipment and highly engineered services, today announced upon the recommendation of the Company's management and in consultation with the Company's Audit Committee and the Company's independent registered public accounting firm, BDO USA, LLP, on January 4, 2018 determined that the Company historically should have accounted differently for certain contracts within its

Energy Segment. As disclosed in the Company's 2017 Annual Report on Form 10-K, revenue was historically recognized for the Energy Segment upon transfer of title and risk to customers or based upon the percentage of completion method of accounting for electrical products built to customer specifications. The Company has determined that, in the case of contracts for which revenue was recorded upon contract completion and transfer of title, the Company instead should have applied the percentage of completion method. The FASB's Accounting Standards Codification 605-35-25-92 notes that "the completed contract method may be used as an entity's basic accounting policy in circumstances in which financial position and results of operations would not vary materially from those resulting from use of the percentage-of-completion method (for example, in circumstances in which an entity has primarily short-term contracts)." In general, the percentage-of-completion method results in a revenue recognition pattern over time as a project progresses as opposed to deferring revenues until project completion under the completed contract method.

As a result, the Company is currently reviewing whether its historical accounting for these contracts differs materially from the percentage-of-completion method and if there are any significant impacts to the Company's audited consolidated financial statements for the fiscal years ended February 28, 2015 and 2017, and the fiscal year ended February 29, 2016, as contained in its 2017 Annual Report on Form 10-K and the previously issued unaudited financial statements contained in its Quarterly Reports on Form 10-Q for the quarters ended May 31, 2017 and August 31, 2017. The analysis is ongoing, and the Company cannot yet estimate when it will be completed. However, the Company is working diligently and expeditiously to complete the review and will provide any updates when and if they become available. Accordingly, the Company cannot yet conclude upon the materiality of any potential adjustments. As the review is ongoing, the Company is currently unable to file its Quarterly Report on Form 10-Q for the quarter ended November 30, 2017. The Company expects to file a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission regarding the delayed filing.

79.     In addition to demonstrating the apparent falsity of the Energy Segment's revenue figures, the January 9, 2017 press release showed that the company's statements concerning the evaluation of new revenue recognition standards over two-and-a-half years had been inaccurate. If it had actually been studying the issue, it would have revealed its revenue recognition issues earlier.

## **CLASS ACTION ALLEGATIONS**

80.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired AZZ securities between April 22, 2015 through January 8, 2018, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

81.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AZZ securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of April 10, 2017, there were 26,020,582 shares of AZZ stock outstanding. Record owners and other members of the Class may be identified from records maintained by AZZ or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.      Whether the price of the Company's stock was artificially inflated; and

f.      The extent of damage sustained by Class members and the appropriate measure of damages.

83.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

84.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

85.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

86.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

87.     During the Class Period, Plaintiff and the Class purchased AZZ securities at artificially inflated prices and were damaged thereby.

88.     On January 9, 2018, before trading opened, AZZ that it "should have accounted differently for certain contracts within its Energy Segment." As a result, the Company is "reviewing" three-and-a-half fiscal years of accounting.

89.     Moreover, the Company had announced as early as July 2015 that it was studying the very revenue-recognition issues that it revealed, on January 9, 2018, it had been misapplying. (FASB's ASU 2014-09 superseded Accounting Standards Codification 605-35). Notwithstanding two-and-a-half years of study, on January 9, 2018 the Company said it "cannot yet estimate when [the review] will be completed."

90.     On this news, AZZ's share price fell 6.2% to close at $47.50 on January 9, 2018, down from a close of $50.64 on January 8, 2018.

91.     This decline is directly attributable to the Company's January 9, 2018 revelation that it had been improperly recognizing revenue, notwithstanding its claims – over two-and-a-half years – to have been studying the issue.

## **FRAUD ON THE MARKET**

92.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      The omissions and misrepresentations were material;

c.      The Company's common stock traded in efficient markets;

d.      The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.      Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

93.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

94.     The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

95.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

96.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

97.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they

25

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

99.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and

immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

102.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.     As set forth above, AZZ and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.      awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.      awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  January 11, 2018                    **KENDALL LAW GROUP, PLLC**

                                            */s/ Joe Kendall*
                                            Joe Kendall
                                            Texas Bar No. 11260700
                                            Jamie J. McKey
                                            Texas Bar No. 24045262
                                            3232 McKinney Avenue, Suite 700
                                            Dallas, TX 75204
                                            Telephone:  (214) 744-3000
                                            Facsimile:  (214) 744-3015
                                            jkendall@kendalllawgroup.com
                                            jmckey@kendalllawgroup.com

                                            **BLOCK & LEVITON LLP**
                                            Jeffrey C. Block *(pro hac vice forthcoming)*
                                            Bradley J. Vettraino *(pro hac vice forthcoming)*
                                            Thomas W. Kirchofer *(pro hac vice forthcoming)*
                                            155 Federal Street, Suite 400
                                            Boston, MA 02110
                                            Tel: 617-398-5600
                                            Fax: 617-507-6020
                                            Jeff@blockesq.com
                                            Bradley@blockesq.com
                                            Tom@blockesq.com

                                            *Counsel for Plaintiff*